Thank you, Your Honor. Benjamin Pavone appearing for the appellant inmates. I'd like to start by just quickly taking inventory in that this problem started in 1999, 23 years ago, when the state of California constructed Coalinga State Hospital next to Pleasant Valley State Prison. And over the next few years, a large number of coccy spores blanketed PVSP. And by 2004, which was 18 years ago, incidence rates at PVSP started to climb. They climbed to epidemic levels in 2005 and 2006. And within our pool of cases, the earliest cases that we accepted were in 2006, which was 16 years ago. We accepted cases through 2013. That was 10 years ago. And we filed our first case in January of 2013, also 10 years ago. We've been in front of three district courts out of four in California. We've been to this court three times. We've been before the Supreme Court once. So my point here is that in light of, you know, a fairly unusual magnitude of effort and a fairly unusual magnitude of patience, we come before this court asking for a relatively small legal finding, which is we're only asking this court to find that our position is plausible. And, you know, that's, of course, the lowest standard because under this case was dismissed under 1286. Counsel, the issue that I'd appreciate your addressing is immunity, quasi-judicial immunity from suit of the receivers. Yes, of course, which I was just getting to. The question of plausibility, in turn, depends on whether quasi-judicial immunity applies. And that, in turn, depends on whether the receiver had jurisdiction over a valley fever epidemic. Counsel, I want to specifically address, ask you to address our comments in the Hines decision in 2019, where we said that the district, I mean, I'm going to paraphrase, that the district court in Plata had appointed the receivers and that the receivers were in charge of dealing with the valley fever epidemic, broadly speaking. So what effect does that statement in Hines have on our analysis? That the receiver was appointed to deal with the valley fever epidemic? Yes. Well, I guess the receiver was not appointed to attend to the valley fever epidemic. Just as a matter of truth, that's just not true. He was appointed to fix the medical care system. So, you know, to the extent that... Phil, the federal, I mean, I'll quote, the federal receiver appointed by the federal court to assure Eighth Amendment compliance actively managed the state prison system's response to valley fever. Oh. End quote. So what do we make of that discussion in Hines, where they seem to be saying this is within their jurisdiction. They were appointed by the federal court and it's within their jurisdiction. Well, I think we have to be clear. I mean, look, the federal receiver was, led the valley fever response. The court in Hines memorialized that fact. But that's different from saying that the federal receiver was appointed for that purpose. The federal receiver was not appointed for that purpose. He was appointed to reform medical care and his scope of charge was medical care delivery. If he led the response to the valley fever epidemic, which is language we're specifically relying on as him having control over the epidemic, and he did sign the 2007 policy, so there is evidence that he led it, then he is liable if that's outside the scope of his authority. But I guess reading Hines, it appears to me that we're implicitly explaining that it's within the receiver's authority. That's my problem. At least as I read that paragraph as a whole, it suggests the way that it doesn't say it in those that many words, but it appears to say that it was within the authority that was granted by the district court in the first place. I'm sorry, Your Honor. I just don't agree that it reads for that meaning in that, you know, the court was explaining why it was giving qualified immunity to CDCR. And the reason it gave qualified immunity to CDCR was because CDCR relied on the receiver. Whether that reliance was proper or whether the receiver had authority, that court, the Hines court, did not actually answer that question. Again, we're the ones relying on that fact. We've always thought that both the receiver and CDCR had managed policy when it came to the Valley Fever epidemic because both the receiver and CDCR signed the 2007 policy. This court in Hines elected to say that, you know, CDCR had relied on the receiver for that policy, even though they both signed it. We didn't disagree with that. But if that's the case, then we say, well, if the receiver led the response, then he's got to have, well, if he led the response, he's got to lead it within his authority given to him within PLATA. And he's outside that authority within PLATA, clearly. And really, that's the whole issue. I mean, you know, Valley Fever epidemic, remember, is not managed by medical care. It's managed by environmental science. It's managed by prisoner management. And for the receiver, you know, to manage such an epidemic, he would have had to have obtained additional authority from the district court in PLATA. He didn't do that. He would just, you know, generally speaking, you know, there's some dispute about whether he really, really did lead the epidemic. I mean, because there are... Can I jump in and ask you about that point? Because the receivers here rely on the fact that I think in 2013, that the district court finally did order CDCR to comply with what up until then had been the receiver's recommendations. And I didn't get any sense that the district court at that point thought, well, my goodness, you've sort of strayed way outside your mandate. But nonetheless, I'm going to expand it to encompass management of this outbreak. Instead, it seemed like the court just accepted that, yeah, you're doing what you're supposed to be doing. You're doing what I want you to be doing under my jurisdiction. And CDCR stopped, you know, stonewalling them and comply with these directives. So they rely upon that fact, and you say it's of no moment. I don't understand why. Well, you know, the PLATA opinion is a complex opinion, and you have to really read it carefully. It took me some time, at least, to digest it. But ultimately, the PLATA court did not give the receiver or recognize that the receiver had authority over public health care. He relied on the receiver's policy, and he ultimately ordered CDCR to comply with it, because that was an Eighth Amendment violation, not because the receiver had authority over that subject. You know, he cited the receiver many times as involved, and, you know, he refers to him, and he says, you know, manage the meet and confer process. I mean, he involves the receiver in a number of capacities. But in terms of actually recognizing that he had authority over the problem, that the PLATA court did not say. In fact, other language from a different PLATA order says, I am not going to give the receiver any authority beyond medical care delivery, and he didn't. And that is also consistent with the Coleman opinion in 2020, which both doesn't give the receiver authority over COVID-19 and cites the Valley Fever epidemic, our epidemic, as authority for the receiver not having authority over public health, including Valley Fever management. But I thought you had said, the reason I jumped in when I did, is that you said that the receivers did not have authority under the original mandate given to them to manage this outbreak. They would have had to go back to the district court and get an expansion of that authority, right, in order to take, and that's what I was saying. I guess I read that, I didn't read that opinion as the district court saying basically what you just said, that, hey, receiver, you've been making these recommendations, you know, from what, 2007 until 2013. These people aren't following your recommendations. That's because you really didn't have any authority to direct them to do anything. I am now going to expand the scope of your authority so that I can order them to comply with what you've been telling them to do. I didn't read the opinion as saying that. It just sounded like the court just said, yeah, I'm glad that you're taking this on in my stead, and CDCR, get with the program, no? No, the plot to court really, you know, look, the plot to court didn't expressly say, hey, you don't have authority to do anything here, all right? In fairness to your point, it wasn't that expressed, because maybe, you know, it didn't want to create a sort of conflict with the receiver's actions, because it felt the and consistent with what it wanted. But it was clear, if you read that opinion carefully, especially the end, it's clear that it draws a very firm line at, look, the receiver's actions are, you know, useful, helpful, you know, we take input from his policy and his recommended policy, but no, I am not recognizing him as having authority. I am only recognizing him as having, let's say, intelligence. And for that reason, the court under the Eighth Amendment, which is, you know, where its jurisdiction flows from, as opposed to its OAR in 2005 and 2006, it, you know, it finds an Eighth Amendment violation, and that's the basis upon which it issues its orders for removal. But even so, I mean, even if the court is entertaining in 2013, the idea that the receiver might have, let's say, some authority or has some role, you know, at most in 2013, it grants some authority. All of our torts, all of our cases of contraction fall from between 2006 and 2013. So we're still safe, because for sure the district court never assumed jurisdiction over public health until PLO brought its motion, and there couldn't be any, you know, real claim that he had done so without ever having a case or a controversy before him to entertain that proposition. Can I ask you just a question that's a little bit off point, but it's just been bothering me, and, but I know you'll have an answer. It seems like there's just a fundamental contradiction in some ways with the claim you're asserting, because on the one hand, you're saying, receiver, you never had authority to lift one finger to address this, and yet you want to sue the receiver in damages for not doing enough, and it just seems like there's something odd about that. Maybe you can help me understand what's going on. I appreciate that, Justice Watford. You know, there is sort of a, you know, a two-cute by half element to our theory, and I do appreciate that, but, you know, if I am walking a line, and it's a thin one, I'll grant you, but it is a line that I can walk through, and here's why. You know, the receiver, look, the receiver had the right as the receiver to do, you know, most anything he wanted. I mean, he's the receiver. He can engage in his own little public health program if he wants. The question is whether he can dictate that as policy to CDCR. So, you know, in this court's determination in Hines that the receiver did lead it, we, one, say, look, he didn't have authority to lead it as imposing policy, but having decided to lead it in violation of his, you know, receivership parameter of authority, or perimeter of authority, he did it wrong. And, yes, you know, in a way, it's, you know, I guess I would say the law, his duty should have been either stay out of it or do it right, and, you know, we're saying that he didn't stay out of it, and he didn't do it right. You know, if he was going to get in it, he had to do it right. If he wanted to stay out of it, he could have stayed out of it, but since he did get into it, and he did it wrong, then he's got to face liability. Yeah. No, okay. I appreciate that. And listen, I don't know how this case is going to be decided, but just speaking for myself, I admire what you've done here for this crusade to get justice for these people. I think what happened to them, it's outrageous. I really am kind of shocked at just the sheer negligence. I don't know if it's on the receiver's part, CDCR's part, I'm not even sure that our decision in Hines is right. But anyway, just the theory you're bringing to us seemed to me to have this contradiction, so I wanted to give you a chance to address that. You're running down on your time. Why don't we hear from the receivers, and we'll give you some time for rebuttal. Yes, sir. Thank you. May it please the court, good morning. I'm Martin Dodd, counsel for the appellees, Bob Zillin, and Clark Kelso, the federal receivers. The court should affirm the judgment of dismissal without leave to amend. I think the court has hit on the most important points here, in terms of talking about the receiver's jurisdiction. I also want to recognize that it is unfortunate what happened to these prisoners. No one disputes or doubts that. But that's not the issue before the court. The issue before the court is whether the receivers should be responsible because they lack immunity. And the answer to that question is, they cannot be responsible because they do have immunity. And I also want to stress that the inmates have conceded that point. That is, if the receivers have jurisdiction, then in whatever capacity they may have ensued in, there is immunity. Yeah, but I was confused by the tact you took in your brief, which was somehow, tell me if maybe I'm mischaracterizing, so I want you to correct me. But I thought you said that if the district court had subject matter jurisdiction in some vague way over this problem, then automatically the receiver is kind of swept up within that immunity. And it seemed to me that can't be right. The right question, it seems to me, is we need to look at the original order and find out what was the scope of authority conferred by that order on the receivers. And if this management of this outbreak was within the scope of that, then yeah, you win. But if it wasn't, and I will say that the language, at least of the original order, is kind of an odd fit, given the fixes, as your opponent points out, given the fixes that are needed to address this kind of problem. They're not really, right, they're not in the heartland, certainly, of managing the medical care delivery system. Well, I think that's correct to a point. And I agree with you that you have to look at the order appointing receiver. The reason why we focused on the subject matter jurisdiction of the district court is because this court, in the New Alaska Development Corporation case, and in a Fifth Circuit case, Davis v. Bayless, I think is the name of the case. There's a clear, in making the immunity determination, the first question is, did the court have subject matter jurisdiction? Because if the court has subject matter jurisdiction, then the receiver, in carrying out the court's mandate, is acting pursuant to that jurisdiction. Well, the opposite would be true. If the court lacked jurisdiction, they couldn't confer any immunity on the receivers. But it's a necessary but not a sufficient condition for you to prevail. Yes, absolutely. And we don't say that just because there was subject matter jurisdiction. We do have to look to say, well, what was the jurisdiction of the receiver? And if there was some jurisdiction, and I think this is the correct analysis, if there was jurisdiction, then... Well, but jurisdiction, I just, I don't know. I would just say, was there authority conferred on the receiver to address this particular problem? And just, maybe just head on your argument that, look, we're talking about the kinds of fixes that would be needed are so far removed from the sort of outside the prison, you know, management of the delivery of health care to individual inmates that it is outside the scopes. So why is that? Well, I think that's not exactly right. And I think part of the problem is that the response to something like Valley Fever or COVID-19 is maybe even a better example because the district court and the receiver and CDCR have all been actively involved in trying to address COVID-19 in the prisons. The public health and disease prevention bailiwick has many, is multifaceted. There's undoubtedly multifaceted. And the receiver has, in his capacity of head of medical care, certainly has much to say and a lot about that process. CDCR does as well. And so you've got perhaps overlapping authority from time to time. And so working that out is the subject of, has gone before the plot of court, has even become for this court. The COVID-19, I just, I disagree with you that it's a good match. If the problem were that, listen, the prison folks weren't, they didn't put in place a regime to get everyone vaccinated or the kind of treatment that was being given to inmates to treat this condition was falling below the level. That kind of thing, I, that is an easy fit, but there is no vaccine and there's no treatment, right? All you can do is you've got to move people around. You've got to try to control, you know, dust and the like. It just seems like it's outside what we would normally consider delivery of healthcare. Well, I, and I guess I come back to, I guess I come back to, let's start with the, with the order appointing receiver. Does it say specifically in there, anything about public health? The answer is no, clearly does not. But it does say that the receiver has all powers of the secretary insofar as medical care delivery system is concerned. To the extent, no one would dispute that to the extent that one of those powers for the, for the, hang on just one second. Did we lose our, there we go. Okay. Sorry. Go ahead. I need to make a fixture on my camera. Yeah, yeah. That's fine. I just want to make sure you're still there. To the extent that the secretary of CDCR, and in his capacity as heading up the medical care system, had some responsibility for responding to an epidemic and disease prevention, then that power was conferred on the receiver insofar as that's part of the medical care system. More importantly though, and here's where I think we really need to focus. The receiver in his plan of action in 2007, one of the first things that the receiver did was, because he had to, was to put forth a plan of action. And in that plan of action, he specifically called out, specifically called out that he was going to set up a public health unit, that he was going to have to address pandemic response. He was going to have to address disease, disease control and protection of inmates with chronic health conditions, which becomes very important when he, when he get down to the exclusion criteria under Valley Fever. CDCR, and after all, it's kind of ironic, but really it's CDCR who would be the folks who position here. CDCR is not shy about asserting his prerogatives. CDCR did not say, wait a minute, wait a minute. The receiver has no business talking to us about public health. That's not within his sphere. The plaintiffs in PLATA, of course, thought were quite happy with the receiver taking that position. And, and, and Judge Henderson, Judge Henderson approved, adopted that plan. No one objected to the receiver's position there. Judge Henderson adopted that plan. In 2008, the current receiver put forth his own turnaround plan of action. And in doing so, wrote his cover letter to the court and went to everyone and said, look, I understand that we don't specifically talk about public health measures here, but that's part of my job. Disease control is part of my job. It's not necessarily because we think that if we follow this turnaround plan, we're going to be able to address those things. Again, no one suggested that there was anything untoward about that or that the receiver was going outside the outside the realm of what the receiver should be doing. And the court adopted that plan. So we've got effectively two orders already in the early days of the receivership that essentially bless the receiver taking on responsibility for certain kinds of public health and disease prevention methods. Okay. Maybe you can address then the 2013 order. Am I getting the dates right? Yes. Your opponent says that actually what the court there maybe not explicitly said was that actually what's happened is that there's this independent eighth amendment violation that's occurred. And that's the only reason I'm sort of blessing what the receiver has done. I think, I think that that is a misreading of what, and I think your honor is correct. I think that's a misreading of what Judge Henderson was doing. I think what Judge Henderson was doing because he was a very careful judge was to make sure that he had all the bases covered when issuing that order. But what he did say, and I'm going to quote, plaintiffs request only that the court order implementation of the receiver's policy. Defendants, CDCR, do not argue that the receiver was acting beyond his authority and promulgating the policy. The question before the court is therefore whether the defendant should be ordered to follow a policy adopted by the receiver in the as head of inmate medical care, end quote. I don't see how you can read that in any other way than the judge, Judge Henderson, saying, okay, the receiver has this authority because Judge Henderson, if the judge thought that the receiver didn't have that authority, and just as Judge Tiger said in his order below, there were plenty of opportunities for us to step in and say, no, no, no, no, you're going too far. And they never did that. They didn't. And the parties never did. The parties always understood that the receiver had a role to play in this sphere. And so when Judge Henderson says, okay, I'm going to enforce the policy with some modifications, and I'm going to authorize the receiver going forward to continue to monitor this and to modify the policy as necessary, effectively, the judge was saying, you have the authority to do this. And it's inconceivable to me that the judge would not have made the point of saying, well, gee, I don't know why we're even here. I mean, the issue was brought before Judge Henderson on a motion by the plaintiffs, and CDCR did not say, why are we here? This is not something that the receiver has any business doing. And in fact, and everyone treated the receiver as having that business. And that's why ultimately, this court says to the CDCR officials who said, oh, yeah, well, you know, we listened to the receiver. We tried to do what the receiver wanted to do. And therefore, they had qualified immunity. And Judge Graber, you're correct that the court in Hines specifically said that the valley fever was a subject of the Plata case. And that one of the reasons why the CDCR officials had qualified immunity is because they were following orders of the receiver and the Plata court. And so it's very hard to understand. I mean, one can, I suppose, I mean, I have my own questions about how the Hines court did what it did. And I, you know, but that is a clear recognition that the receivers were acting pursuant to their authority, given to them by the Plata court. I mean, I think in fairness to your opponent, the most I would say you could read Hines for the proposition is that the, you know, for purposes of qualified immunity, the CDCR folks weren't just crazy in thinking that, you know, the receiver had assumed this right or wrong. We just said from the standpoint of the CDCR folks, you know, what are they supposed to do? There's this receiver purporting to exercise this authority, but now we're asked to decide, well, did the receiver have the authority or not? But I don't think that was resulted in Hines. Fair enough. I think that's right. But I mean, I think there was a recognition in part because, I mean, and I do think it's important that no one, given the opportunity, no one, and specifically CDCR and the judges never said to the receiver, get out of here. This is not your responsibility. And it's hard for me to see how we could get to where we are today if the courts and the parties in Plata didn't think that the receiver had a role to play. Now, the question, I suppose, and what plaintiffs want to do is they want to treat this as if it's an all or nothing proposition. That is, there's all the jurisdiction and authority to address valley fever or there's no authority or jurisdiction to address valley fever. And I don't think it's that simple. And I think that's one of the reasons why we find that public health was something in the plan of action and something that the receivers understood they had to address from the beginning. And that is, as I said, there may be overlapping jurisdictions. So, for example, when it came to the ground cover question at PVSB, that recommendation had been made for years and CDCR didn't do anything. And finally, the receiver in frustration said, fine, here's the money, go do it. And so they went and did it. But what the receiver did not do was go to PVSB and tell the ward, get your groundkeepers out here. I'm going to go hire the contractors and bring them out here. The receiver did not do that. And I don't think anybody would ever suggest that the receiver could do that. But instead, the receiver, and that's a form of active management, is it not? Even if the receiver doesn't have the ability to say, thou shalt, he can still say, thou should. And I really think that it's really in your interest that you should. And if you don't, we may have to go talk to the judge about it. But that's a different kind of management, but it's management nonetheless. And to CDCR's credit, in other areas, when the receivers said, you know, the science, that we're telling you, you really ought to do these things. And they said, fine, we can do that. We'll go, yes, that makes sense. We'll do that. Again, that's a kind of active management. But what plaintiffs want to say is that, well, it has to be, all these orders have to be self-executing in order for there to be active management. And I don't think that's what the Hines Court said. And I don't think that that's what makes any sense, is that the receiver can be in a leadership position, making statements and making recommendations and authorizing and a particular way. And if CDCR and the officials say, yeah, okay, fine. They may choose not to go challenge it in front of the judge. They may comply. They may, any number of things. The receiver is in a leadership role and is managing that process. And in that sense, I think the COVID-19 experience is quite relevant in that there has been an ongoing interaction between the secretary, the receiver. Sometimes the receiver makes strong recommendations. Sometimes CDCR has said no. Sometimes they've said yes. I don't think anybody would dispute that the receiver is actively managing that process, but not necessarily to the exclusion of anyone else. And that's really what we're trying to say. And if there is jurisdiction, and there is, then the scope of it, then it's just a question of, well, did he go far enough or not far enough or too far? And that conduct is immunized and you should affirm. Thank you. Okay. Thank you very much. Let's put a couple of minutes on the clock if there's less than that for rebuttal. Okay. Go ahead. Thank you, Your Honors. Just quickly, I think the court should understand the standard upon which it would either affirm or reverse, namely that if there's a dispute in the evidence, it's not this court's prerogative to weigh that evidence or decide that issue. Really, the issue before the court is whether our theory is plausible or not. And the receiver raises some evidentiary, what I consider a smidgen of evidence to support that it had public health authority in comparison to what we view as a much larger record that his authority was strictly limited to medical care delivery. So, you know, maybe the receiver's position is plausible. I think ours is more right down the middle in terms of it not being medical care delivery, and therefore not being within his authority. And I think his example, you know, where the what quasi-judicial immunity really means. I mean, it means that he has to have authority to dictate it. You know, again, the receiver is a health expert. He is in charge of a $4 billion corporation, and he can do all kinds of things that, you know, are useful, helpful. He can make recommendations. He can submit policy papers to CDCR. He can do a litany of tasks and services that are beneficial. But the question of whether he's liable for a policy depends on whether he has authority over that policy. And these things like the soil sample and making recommendations, those are not within his authority, although they may be a good idea. So I would stand on that. Okay. Thank you both very much for your arguments today. The case just argued is submitted, and we are adjourned for this session.
judges: GRABER, WATFORD, Bataillon